536 S.E.2d 79

**The STATE, Appellant,**

v.

**Naim JIHAD, Respondent.**

No. 3124.

Court of Appeals of South Carolina.

Heard Dec. 7, 1999.
Decided Feb. 22, 2000.
Rehearing Denied May 13, 2000.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott and Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor George M. Ducworth, of Anderson, for appellant.

Kenneth W. Sheppard, of Atlanta, Ga.; and Nancy Jo Thomason, of Anderson, for respondent.

STILWELL, Judge:

An Anderson County grand jury indicted Naim Jihad for trafficking in marijuana. The trial court granted Jihad's motion to suppress the drug evidence due to an illegal traffic stop by the arresting officer. The State appeals. We affirm.

## FACTS/PROCEDURAL HISTORY

On December 3, 1997, a highway patrol officer stopped Jihad on Interstate 85 when he observed that the right brake/tail light on Jihad's 1971 vehicle was not operating. The officer gave Jihad a verbal warning and initially intended to allow him to proceed. However, the officer determined that Jihad was acting in an odd manner and noticed several suspicious indicators. Specifically, the officer noticed an overwhelming odor of Downy fabric softener emanating from the vehicle, along with the presence of a number of brand new air fresheners. Additionally, the officer saw a pile of dirty clothes in the back seat, which he found inconsistent with the smell of Downy.

Jihad refused the officer's request to search the vehicle. The officer, however, based on the reasons stated above, summoned a K–9 unit. When the search dog alerted to the passenger side of the vehicle, the officer searched the car and found a black travel bag containing approximately fifteen pounds of marijuana. The officer arrested Jihad and an Anderson County grand jury indicted him for trafficking.

On June 10, 1998, the court held a pretrial hearing on the admissibility of the drug evidence. Jihad argued the evidence was inadmissible under the exclusionary rule for two reasons: (1) the stop leading to the search was itself illegal, and (2) the officer did not have probable cause to search the vehicle. After brief arguments, the trial court granted Jihad's motion to suppress based solely on the lack of probable cause for the stop. The State appeals this ruling.

## LAW/ANALYSIS

Evidence obtained as a result of an unreasonable search or seizure is inadmissible. *See State v. Easterling*, 257 S.C. 239, 185 S.E.2d 366 (1971) (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). An officer's decision to stop a vehicle generally is reasonable if he has probable cause to believe a traffic violation has occurred. *See State v. Smith*, 329 S.C. 550, 495 S.E.2d 798 (Ct.App.1998) (citing *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)), *cert. dismissed as improvidently granted*, 335 S.C. 550, 518 S.E.2d 821, *and cert. denied*, 528 U.S. 1063, 120 S.Ct. 619, 145 L.Ed.2d 513 (1999). Here, it is undisputed that Jihad's right brake light was not working when the officer pulled him over. The State argues that because Jihad's vehicle featured two "stop lamps," the statutory provisions regarding vehicle safety mandate that *both* lamps be "maintained in good working order." We disagree.

As an initial matter, an understanding of the various vehicle lamp requirements and the purpose or purposes they serve is essential. To comply with South Carolina law, a motor vehicle driven in this state must be equipped with at least one rear-mounted tail lamp which emits a red light visible from 500 feet. S.C.Code Ann. § 56-5-4510 (1991). Similarly, head lamps are required on the front of all vehicles, at least one for

motorcycles and motor-driven cycles and at least two for all other motor vehicles. S.C.Code Ann. § 56–5–4490 (1991). Both tail lights and headlights must be illuminated "from a half hour after sunset to a half hour before sunrise" and during periods of inclement weather or adverse environmental conditions. S.C.Code Ann. § 56–5–4450 (1991). Signal lamps or devices, on the other hand, are activated only in particular situations, *i.e.*, when the driver intends to signal other motorists, either in front or behind, of some impending maneuver. Accordingly, both brake lights and turn signals are encompassed in the phrase "signal lamps and signal devices." *See* S.C.Code Ann. § 56–5–4730 (1991).

A rear-mounted stop lamp, or brake light, is a signal lamp which emits a red or yellow light actuated "upon application of the service (foot) brake," which "may but need not be incorporated with a tail lamp[.]" S.C.Code Ann. § 56–5–4730(1) (1991). A stop lamp, therefore, indicates a vehicle is slowing down or possibly coming to a complete stop. A turn signal is a lamp or mechanical signal device "capable of clearly indicating any intention to turn either to the right or to the left" which "shall be visible both from the front and rear" of the vehicle. S.C.Code Ann. § 56–5–4730(2) (1991). All signal lamps and devices must be visible from a distance of 100 feet. S.C.Code Ann. § 56–5–4730 (1991).

In this case, the officer initially stopped Jihad for a broken right brake/tail light. Though these terms are technically distinct, both appear in the record and are used interchangeably by the parties. However, both the State and Jihad agreed below that § 56–5–4560 governing stop lamps is the applicable statute. We therefore focus on the statutory scheme concerning stop, or brake, lights.[1]

There is no doubt that at least one stop lamp or brake light is required on all new motor vehicles sold or driven in this state after July 1, 1949:

---

1. In any event, the outcome is the same. Section 56–5–4510 of the Code requires "at least one tail lamp" on every motor vehicle. S.C.Code Ann. § 56–5–4510 (1991). Since we conclude that only one functioning brake light is also required, the distinction is immaterial because the light on only one side of Jihad's vehicle, the right rear side, was not illuminated.

From and after July 1, 1949 it shall be unlawful for any person to sell any new motor vehicle, including any motorcycle or motor-driven cycle, in this State or for any person to drive such vehicle on the highways unless it is equipped with a *stop lamp* meeting the requirements of § 56–5–4730.

S.C.Code Ann. § 56–5–4560 (1991) (emphasis added). Section 56–5–4730 reads, in relevant part:

Any motor vehicle may be equipped, and when required under this chapter shall be equipped, with the following signal lamps and devices:

(1) A *stop lamp* on the rear which shall emit a red or yellow light and which shall be actuated upon application of the service (foot) brake and which may but need not be incorporated with a tail lamp; and

(2) A lamp or lamps or mechanical signal device capable of clearly indicating any intention to turn either to the right or to the left and which shall be visible both from the front and rear.

A *stop lamp* shall be plainly visible and understandable from a distance of one hundred feet to the rear both during normal sunlight and at nighttime and a *signal lamp* or lamps indicating intention to turn shall be visible and understandable during daytime and nighttime from a distance of one hundred feet both to the front and rear. When a vehicle is equipped with a *stop lamp* or other signal lamps, *such lamp* or lamps shall at all times be maintained in good working condition....

S.C.Code Ann. § 56–5–4730 (1991) (emphasis added). Despite the repeated statutory references to a singular stop *lamp*, however, the State contends that such a reading leads to an "unwarranted and absurd result." We disagree.

When the language of a statute is "plain and unambiguous, and conveys a clear and definite meaning," there is no need to employ rules of statutory construction, and this court "has no right to look for or impose another meaning." *City of Columbia v. American Civil Liberties Union*, 323 S.C. 384, 387, 475 S.E.2d 747, 749 (1996). "This Court cannot construe a statute without regard to its plain and ordinary meaning, and may not resort to subtle or forced construction

in an attempt to limit or expand a statute's scope." *Id.* at 388, 475 S.E.2d at 749.

■  Here, the statutory terms are clear. At no point in the text of either statute regulating vehicle brake lights is the term stop lamp pluralized. To the contrary, both §§ 56–5–4560 and 56–5–4730 employ the singular stop *lamp*. This court simply cannot ignore such patent and definite statutory language in order to force a construction not intended by the legislature. *See Whitner v. State,* 328 S.C. 1, 6, 492 S.E.2d 777, 779 (1997) (explaining "where a statute is complete, plain, and unambiguous, legislative intent must be determined from the language of the statute itself."), *cert. denied,* 523 U.S. 1145, 118 S.Ct. 1857, 140 L.Ed.2d 1104 (1998). The plain language of the statutes indicates a legislative desire to require that every motor vehicle have at least one functioning stop lamp or brake light.[2]  Indeed the State itself admits as much, stating in its brief that § 56–5–4730 "merely sets forth the *minimum* requirements for 'signal lamps and signal devices' " employed on a motor vehicle. (Emphasis in original.)

This view also is supported by a review of § 56–5–4490, which mandates head lamps on all motor vehicles. There, the statute explicitly states that each vehicle "shall be equipped *with at least two* head lamps," at least one of which shall be "on each side of the front of the motor vehicle." S.C.Code Ann. § 56–5–4490 (1991) (emphasis added). We agree with Jihad that if the legislature had intended to require more than one working stop lamp, it would have expressly stated its intention in the statutory language of §§ 56–5–4560 and 56–5–4730, as it so clearly did in § 56–5–4490. Moreover, we believe our interpretation best comports with the rule that statutory language must be construed in the light of the intended purpose of the statute. *See Adams v. Texfi Indus.,*

2.  Neither statutory heading, "Stop lamps required on motor vehicles," or "Signal lamps and signal devices," is inconsistent with this reading. Moreover, because they are not part of the statute itself, such headings are irrelevant in statutory construction. *See* S.C.Code Ann. § 2–13–175 (Supp.1999) ("The catch line heading or caption which immediately follows the section number of any section of the Code of Laws must not be deemed to be part of the section and must not be used to construe the section more broadly or narrowly than the text of the section would indicate. . . .").

320 S.C. 213, 464 S.E.2d 109 (1995); *Kiriakides v. United Artists Communications, Inc.*, 312 S.C. 271, 440 S.E.2d 364 (1994). As noted earlier, a stop lamp or brake light serves as a signal to other drivers that a vehicle is either slowing down or stopping, and this purpose is fulfilled when just one such light is engaged.

The State argues further, however, that the trial court's decision "fails to give full effect to the apparent intent of the Legislature in regulating the safe operating condition of vehicles traveling on South Carolina's public highways." Specifically, the State asserts §§ 56–5–4410 and 56–5–5310, in conjunction with the latter part of § 56–5–4730, evidence a legislative purpose to secure the public's safety.[3] According to the State, therefore, the trial court's ruling "creates an entire class of equipment that may be legally used on a vehicle in an unsafe or defective condition, simply because the equipment is in excess of the Motor Vehicle Code's minimum requirements." In our view, this analysis simply begs the question. There is no doubt these statutes apply to regulate the operating condition of those equipment features which the law requires. Nothing in the language employed, however, suggests an intent to regulate extraneous mechanical features not deemed mandatory by the legislature. We thoroughly agree with the State that highway safety is an important public good. We also agree that the "foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed *violations." Delaware v. Prouse,*

---

3. Section 56–5–4410 reads in relevant part:

   It shall be unlawful for any person to drive ... on any highway any vehicle ... which is in such an unsafe condition as to endanger any person or property or which does not contain those parts or is not at all times equipped with lights, brakes, steering and other equipment in proper condition....

   S.C.Code Ann. § 56–5–4410 (1991).

   Section § 56–5–5310 similarly states:

   No person shall drive or move on any highway any vehicle unless the equipment thereon is in good working order ... and the vehicle is in such safe mechanical condition as not to endanger the driver or other occupant or any person....

   S.C.Code Ann. § 56–5–5310 (1991).

   As the State did not argue § 56–5–5310 below, it is not preserved for appellate review. *See State v. Conyers*, 326 S.C. 263, 487 S.E.2d 181 (1997).

440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (emphasis added).

█ There is no dispute that Jihad's vehicle had at least one brake light (on the left side) in good working condition at the time the officer effected the stop. Because we find the statutory scheme mandates only one functioning "stop lamp," in this instance Jihad's vehicle was in full compliance with all statutory requirements regarding rear vehicle lights. Since neither Jihad's driving nor his vehicle transgressed any traffic law, the patrolman's stop was unreasonable. *Cf. Sikes v. State,* 323 S.C. 28, 448 S.E.2d 560 (1994) (explaining that an officer must have a reasonable suspicion of criminal activity to stop a car). The marijuana, as fruit of the poisonous tree, is therefore inadmissable. *See State v. Copeland,* 321 S.C. 318, 323, 468 S.E.2d 620, 624 (1996) ("The 'fruit of the poisonous tree' doctrine provides that evidence must be excluded if it would not have come to light but for the illegal actions of the police, and the evidence has been obtained by the exploitation of that illegality.") (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

Accordingly, the trial court's decision to suppress the marijuana is

**AFFIRMED.**

CONNOR, J., concurs.

ANDERSON, J., dissents in separate opinion.

ANDERSON, Judge (dissenting):

I respectfully dissent. The majority holds the patrolman's stop of Jihad's car was unreasonable, thus, the marijuana, as fruit of the poisonous tree, is Inadmissible. I disagree.

## I. *RIGHT TO STOP*

The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV. Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of

"persons" within the meaning of this provision. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. *Whren, supra.* The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions. *Prouse, supra.*

In contrariety to the conclusion by the majority that "probable cause to believe a traffic violation has occurred" is necessary before a traffic stop is permitted, I believe the constitutional guideline in regard to a traffic stop is *"reasonable suspicion."* The majority cites *State v. Smith*, 329 S.C. 550, 495 S.E.2d 798 (Ct.App.1998), for the proposition that "probable cause" is essential. Yet, *Smith* cites *Knight v. State*, 284 S.C. 138, 325 S.E.2d 535 (1985). In Knight, our Supreme Court held:

> Appellant argues the seizure of the hatchet was illegal because the officer lacked probable cause for stopping the vehicle. However, a police officer may stop an automobile and briefly detain its occupants, *even without probable cause to arrest*, if he has a *reasonable suspicion* that the occupants are involved in criminal activity.

*Knight*, 284 S.C. at 141, 325 S.E.2d at 537–38 (emphasis added). Further explicating the law of a *Terry* [1] stop is *Sikes v. State*, 323 S.C. 28, 448 S.E.2d 560 (1994). *Sikes* enunciates:

> The scope and duration of seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In South Carolina, we have gone a little further by holding that an officer may stop a car and briefly detain the occupants if he has a *reasonable suspicion* that the occupants are involved in *criminal activity*.

*Sikes*, 323 S.C. at 30–31, 448 S.E.2d at 562 (emphasis in original).

---

1. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

A police officer may conduct a constitutionally valid traffic stop when the officer has a reasonable suspicion that either the vehicle or an occupant is subject to seizure for violation of the law. *See Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). As long as an officer reasonably suspects the driver is violating "any one of the multitude of applicable traffic and equipment regulations," the police officer may legally stop the vehicle. *Id.* at 661, 99 S.Ct. at 1400, 59 L.Ed.2d at 672. Reasonable suspicion is a lesser standard than probable cause and allows an officer to effectuate a stop when there is some objective manifestation of criminal activity involving the person stopped. *See United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Reasonable suspicion exists when an officer can identify specific facts that, when taken together with rational inferences from those facts, would warrant a person of reasonable caution in the belief that the detainee has committed (or is committing) a crime. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The propriety of a stop must be viewed in light of the totality of the surrounding circumstances. *See United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

No further inquiry beyond the requirement of reasonable suspicion is necessary or warranted. *State v. Carlson,* 102 Ohio App.3d 585, 657 N.E.2d 591 (1995). Thus, if the specific and articulable facts available to an officer indicate a motorist may be committing a criminal act, which includes the violation of a traffic law, the officer is justified in making the stop. *Id.* Similarly, the United States Supreme Court has concluded an officer's subjective motive does not invalidate behavior that is objectively justified under the Fourth Amendment. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (police officer may stop driver for any observed traffic offense even if officer's motivation for making stop is unrelated to observed traffic offense). To satisfy the reasonable suspicion standard, the State is not required to prove the suspected motor vehicle violation occurred. *State v. Williamson,* 138 N.J. 302, 650 A.2d 348 (1994); *see also Marben v. State of Minnesota, Dep't of Pub. Safety,* 294 N.W.2d 697 (Minn.1980) (an actual traffic violation need not be detectable; all that is required is that the stop be not the product of mere whim, caprice, or idle curiosity).

The reasonableness of the detention is not limited to investigating the circumstances of the traffic stop. *See United States v. Johnson,* 58 F.3d 356 (8th Cir.1995). If, during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden the inquiry and satisfy those suspicions. *See State v. Blassingame,* 338 S.C. 240, 525 S.E.2d 535 (1999).

A driver who commits a traffic violation has a lessened expectation of privacy. *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). Motorists are aware that, *"[a]s an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order." South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000, 1004 (1976)(emphasis added).

## II. *SOUTH CAROLINA STATUTORY LAW*

South Carolina Code Ann. § 56–5–4410 (1991), which is entitled "Unlawful to operate unsafe or improperly equipped vehicle, or to violate any provisions of article", reads in pertinent part:

It shall be unlawful for any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle or combination of vehicles which is in such an unsafe condition as to endanger any person or property or which does not contain those parts or is not at all times equipped with lights, brakes, steering and other equipment in proper condition....

Pursuant to § 56–5–4730, "[w]hen a vehicle is equipped with a stop lamp or other signal lamps, such lamp or lamps shall at all times be maintained in good working condition." S.C.Code Ann. § 56–5–4730 (1991).

Section 56–5–5310 provides:

No person shall drive or move on any highway any vehicle unless the equipment thereon is in good working order and adjustment as required in this chapter and the vehicle is in

such safe mechanical condition as not to endanger the driver or other occupant or any person upon the highway. S.C.Code Ann. § 56–5–5310 (1991).

## III. *STATUTORY CONSTRUCTION*

The cardinal rule of statutory construction is to ascertain and effectuate the legislative intent whenever possible. *City of Camden v. Brassell*, 326 S.C. 556, 486 S.E.2d 492 (Ct.App. 1997). All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *Ray Bell Constr. Co. v. School Dist. of Greenville County*, 331 S.C. 19, 501 S.E.2d 725 (1998). The determination of legislative intent is a matter of law. *City of Sumter Police Dep't v. One (1) 1992 Blue Mazda Truck*, 330 S.C. 371, 498 S.E.2d 894 (Ct.App.1998).

The legislature's intent should be ascertained primarily from the plain language of the statute. *Stephen v. Avins Constr. Co.*, 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996). The terms must be construed in context and their meaning determined by looking at the other terms used in the statute. *Southern Mut. Church Ins. Co. v. South Carolina Windstorm and Hail Underwriting Ass'n*, 306 S.C. 339, 412 S.E.2d 377 (1991). Courts should consider not merely the language of the particular clause being construed, but the word and its meaning in conjunction with the purpose of the whole statute and the policy of the law. *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (1997). In Interpreting a statute, the language of the statute must be read in a sense which harmonizes with its subject matter and accords with its general purpose. *Hitachi Data Systems Corp. v. Leatherman*, 309 S.C. 174, 420 S.E.2d 843 (1992). Statutes must be read as a whole and sections which are part of the same general statutory scheme must be construed together and each given effect, if it can be done by any reasonable construction. *Higgins v. State*, 307 S.C. 446, 415 S.E.2d 799 (1992). A statute must receive a practical, reasonable and fair Interpretation consonant with the purpose, design, and policy of the lawmakers. *D.W. Flowe & Sons, Inc. v. Christopher Constr. Co.*, 326 S.C. 17, 482 S.E.2d 558 (1997).

In applying the rules of statutory construction to the statutes involved in the case *sub judice,* I come to the ineluctable conclusion that the General Assembly's intent in enacting §§ 56–5–4410, –4730, and –5310 was to provide for the safe operation of vehicles.

States have a vital interest in ensuring that vehicles are fit for safe operation. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "The foremost method of enforcing traffic and vehicle safety regulations ... is acting upon observed violations." *Id.* at 659, 99 S.Ct. at 1399, 59 L.Ed.2d at 671. Vehicle stops for traffic violations occur countless times each day. *Id.* "Many violations of minimum vehicle-safety requirements are observable, and something can be done about them by the observing officer, directly and immediately." *Id.* at 660, 99 S.Ct. at 1399, 59 L.Ed.2d at 672.

I reject the notion that this vehicle stop should be analyzed under a hypertechnical review of §§ 56–5–4410, –4730, and –5310. The first prong of § 56–5–4410 has efficacy and viability. It stands on its own in reference to vehicles the officer reasonably suspects may be "in such an unsafe condition as to endanger any person or property." The statute relates to the overall safety factor in the condition of the vehicle. Pursuant to § 56–5–5310, it is unlawful for a person to drive any vehicle unless it "is in such safe mechanical condition as not to endanger the driver ... or any person upon the highway." If a police officer observes a vehicle he reasonably suspects is a danger to the public or the driver, the officer should stop the driver to inform him of the danger.

The police activity undertaken in this case should be reviewed under a totality of circumstances test involving an analysis of the actual circumstances existing on the roadway as observed by the law enforcement officer. *See United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)(in determining validity of stop, courts should consider totality of circumstances surrounding the stop).

In a scholarly, after the fact analysis, the majority dissects the statutory provisions with legal precision emasculating the effectiveness of constitutional principles relating to a police officer's right to stop. As a consequence of the decision by

the majority, a negativistic and inhibiting atmosphere will predominate in law enforcement traffic activities rather than a commonsensical and practical evaluation of the vehicle and its equipment while being driven on the public roadways in South Carolina. The egregious result emanating from the holding of the majority is the imposition of a judicial straitjacket upon the ordinary enforcement of traffic regulations. The interlocking of a mandatory statutory violation with constitutional principles relating to the right to stop negates the potency of recognizable precedent originating from the United States Supreme Court.

On a day to day routine engaged in by law enforcement, the majority interjects reticence and reluctance because of the fear of being adjudged wrong in a later analysis. The majority exceeds the prophylactic protections provided by the right to stop principle and unjustifiably implements mandatory requirements wreaking havoc in the public safety arena. The salutary and salubrious enforcement of traffic laws in South Carolina will now be infected by ambiguity and suppositional law enforcement responses. An invidious and subtle atmosphere results from the ruling of the majority triggering police trepidation in an ordinary traffic stop.

Adherence to the doctrine articulated by the majority will mean that the police and appellate courts will have difficulty deciding exactly when a vehicle can be stopped in a traffic stop scenario. Substantially impeding the enforcement of the state's traffic laws by compelling the police to decide traffic violations with exactitude eviscerates the public interest in traffic safety. The majority imbues traffic enforcement with inherent compelling pressures to know statutory provisions with specificity before a reasonable stop can ensue.

Here, the officer had sufficient reasonable suspicion, based on his own observation of the defective tail/brake light, that Jihad had violated the traffic code. Thus, the traffic stop was lawful under the Fourth Amendment and the evidence thereby discovered is admissible. Accordingly, I would reverse the trial court's decision to suppress the marijuana.